**SAUL EWING LLP**
Ruth A. Rauls
650 College Road East
Suite 4000
Princeton, NJ 08540-6603
(609) 452-5049
rrauls@saul.com
*Attorneys for Plaintiff*
*MAIA Pharmaceuticals, Inc.*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MAIA PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> SIGMA-ALDRICH IRELAND, LTD., <br><br> Defendant. | Civil Action No. _____ <br><br><br> **VERIFIED COMPLAINT** |

Plaintiff MAIA Pharmaceuticals, Inc. ("MAIA"), by and through its attorneys, for its Verified Complaint against Sigma-Aldrich Ireland Limited ("Sigma"), alleges and says:

### NATURE OF THE CASE

1. MAIA and Sigma are parties to a Supply Agreement dated August 28, 2015 pursuant to which Sigma agreed to supply MAIA—on an exclusive basis—the active pharmaceutical ingredient ("API") Sodium Benzoate for use in MAIA's development and commercialization of a generic version of the drug Ammonul® (hereinafter the "Exclusive Supply Agreement" or the "Agreement", attached as Exhibit 2 to the Declaration of David Herman).

2. Unbeknownst to MAIA until recently, Sigma has been secretly negotiating to supply and intends to imminently ship to a MAIA competitor Sodium Benzoate to support that competitor's commercial launch of generic Ammonul®, all in violation of MAIA's rights and Sigma's obligations under the Exclusive Supply Agreement.

3. Sigma's violation of MAIA's rights under the Exclusive Supply Agreement is knowing, deliberate and willful. Indeed, Sigma attempted to trick MAIA into giving up its exclusive rights under the Exclusive Supply Agreement by repeatedly misrepresenting to MAIA the purpose and impact of a proposed amendment to the agreement. When MAIA learned that Sigma was attempting to procure the proposed amendment by fraud, MAIA rescinded the proposed amendment prior to the delivery of a final, counter-signed amendment.

4. Notwithstanding its contractual, legal and commercial obligations to MAIA, and a proposed amendment which is neither valid nor enforceable, Sigma has pressed ahead with supplying MAIA's competitor knowing that its actions will result in immediate and irrevocable harm to MAIA.

5. MAIA brings this suit to enforce its rights under the Exclusive Supply Agreement, to prevent Sigma from further breaches of the Exclusive Supply Agreement, and for damages for Sigma's wrongful and fraudulent conduct.

## PARTIES

6. MAIA is a corporation organized and existing under the laws of New Jersey and having its principal place of business in Princeton, New Jersey. Its business includes the development and commercialization of generic and specialty pharmaceutical products.

7. On information and belief, Sigma is a corporation organized and existing under the laws of Ireland and having its principal place of business in Arklow, Ireland.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as there is complete diversity between the parties because the matter in controversy is between a citizen of a state and a citizen of a foreign state and exceeds the sum or value of $75,000, exclusive of interest and costs. Supplemental Jurisdiction over the state law claims is appropriate under 28 U.S.C. § 1367.

9. The Court may exercise personal jurisdiction over the defendant Sigma pursuant to N.J. CT. R. 4:4-4. Sigma has established minimum contacts with the State of New Jersey in connection with its contract (the "Exclusive Supply Agreement") with MAIA, a New Jersey corporation. These contacts are sufficient to give rise to personal jurisdiction. This Court has personal jurisdiction over Sigma as it has sufficient minimum contacts with the State of New Jersey for this Court to exercise personal jurisdiction, including, among other things: (a) conducting business in the State of New Jersey over many years, at least with MAIA; (b) negotiating and entering into contracts, including, but not limited to, the Exclusive Supply Agreement with MAIA, an entity located in the State of New Jersey; (c) selling products to entities located in the State of New Jersey, including MAIA pursuant to the Exclusive Supply Agreement; (d) manufacturing products that are incorporated into products to be sold in the State of New Jersey, including in connection with the Exclusive Supply Agreement; (e) receiving payment in accordance with the Exclusive Supply Agreement from entities located in the State of New Jersey; and (f) causing damages to a New Jersey company within the State of New Jersey.

10. Venue in this district is proper pursuant to 28 U.S.C. § 1391.

## BACKGROUND FACTS

### A.    Ammonul®

11. Ammonul® is a sterile, concentrated, aqueous solution of sodium benzoate and sodium phenylacetate. Ammonul® is indicated for the treatment of acute hyperammonemia and associated encephalopathy in patients with deficiencies in the urea cycle.

12. Currently, there are no generic versions of Ammonul® available.

13. MAIA filed an Abbreviated New Drug Application ("ANDA") for Ammonul® (Sodium Benzoate + Sodium Phenylacetate) in September 2015 in order to receive approval from the Food and Drug Administration ("FDA") to market a generic version of Ammonul®.

14. MAIA was granted expedited review of its ANDA by the FDA. ANDAs subject to expedited review are typically granted seven to ten months after filing. Based on this, MAIA expects its ANDA to be approved perhaps as soon as July of 2016 and no later than December of 2016.

### B.    The Exclusive Supply Agreement

15. MAIA began negotiating the Exclusive Supply Agreement with Sigma in early 2015.

16. Under the Exclusive Supply Agreement, Sigma agreed to manufacture and supply Sodium Benzoate to MAIA on an exclusive basis for generic Ammonul®, specifically defined in the Agreement as a drug therapy for the treatment of hyperammonemia and associated encephalopathy (the "Indication").

17. MAIA invested a great deal of time, money, and effort in working with Sigma to develop its Sodium Benzoate for the Indication. MAIA spent many months and resources working extensively with Sigma to meet FDA standards for its API. This included

revealing confidential information about MAIA's ANDA product, as well as helping Sigma respond to an April 2015 deficiency letter from the FDA.

18. All of this work and planning culminated in the parties entering into the Exclusive Supply Agreement, which MAIA signed on August 1, 2015. Sigma signed and returned the Agreement to MAIA on August 28, 2015. The terms of the Agreement were approved by Sigma in Ireland and Sigma business executives in the United States.

19. The parties agreed under the Exclusive Supply Agreement that any waiver or modification of the terms of the Agreement would not be valid unless in writing and signed by authorized representatives of both parties.

20. The value of this Exclusive Supply Agreement to MAIA (i.e., the ability to be the sole generic version of Ammonul®) is far in excess of $75,000.

### C. Sigma's Attempts to Get MAIA to Give Up Exclusivity: the Proposed Amendment

21. In October 2015, Mr. James Ennis, Site Director of Sigma-Aldrich's Arklow, Ireland facility, contacted MAIA and requested that the parties amend the Exclusive Supply Agreement. Ennis presented MAIA with a Hobbesian choice: either amend the Agreement to allow Sigma to supply two other companies who—according to Ennis— "were miles behind you" in preparing their ANDA filings, or Sigma would move its production of Sodium Benzoate to another facility to avoid the terms of the Exclusive Supply Agreement and would supply at least seven (7) more companies who Ennis claimed wanted to pursue generic Ammonul®.

22. When MAIA objected that this proposal could allow competitors to beat MAIA to the market, Sigma attempted to persuade MAIA by repeatedly misrepresenting the rationale and impact of any proposed amendment.

23. From October 2015 until March 2016, MAIA and Sigma had numerous discussions about the proposed amendment, including conference calls on:

- October 28, 2015
- November 11, 2015
- November 26, 2015
- January 12, 2016
- February 3, 2016

24. During the October 28, 2015 call, Ennis represented that:

- "You [MAIA] are the only ANDA that's sitting out there at the moment for us [Sigma]."
- One of the two companies "hasn't even done their stability batches yet. They need material from two batches from us, and is certainly going to be late next year by the time they would get material from two batches. The other customer is significantly behind as well on the thing."
- The two companies are "miles behind you."
- These two companies are "significantly behind you."
- "Sigma-Aldrich will bring competitors against you. So do you want it to be two or do you want that to be loads?"
- "You [MAIA] are certainly going to be more than first to the market at this particular juncture."
- Ennis confirmed that that the "timeline" the other two companies were looking at would put their ANDA filings sometime in March or April of 2017 at the earliest.

25. During the November 11, 2015 call:

6

- Ennis represented that MAIA was "way ahead of the game."
- Ennis represented that the two companies were at least "18 months literally behind you [MAIA]."
- When MAIA requested that Sigma identify the two companies, Sigma refused, but agreed to supply the names *after* the proposed amendment was signed.

26. Each of these statements were false and were specifically designed to trick MAIA into signing away its exclusivity. Unbeknownst to MAIA at the time, Sigma was working with Trigen to support its generic Ammonul®. Trigen filed its ANDA on May 18, 2014, and was not "miles behind" MAIA.

27. Sigma represented to MAIA that it had supplied some small quantities of Sodium Benzoate to two companies in the past and that neither of these companies had filed an ANDA using Sodium Benzoate. Sigma represented in October 2016 that it was "in a pickle" with those companies, who were demanding Sigma provide them with Sodium Benzoate to support any ANDA filings.

28. In order to induce MAIA into signing the proposed amendment, Sigma represented to MAIA that:

- it had supplied some Sodium Benzoate to two companies in the past and that these companies' development programs were significantly behind MAIA's program;
- neither of these companies filed an ANDA using Sodium Benzoate for the Indication;
- the companies were seeking the Sodium Benzoate to support the filing of an ANDA but not before 2017 to support a possible launch in 2019—at least two years after expected approval and launch of MAIA's ANDA product;

7

- unless MAIA agreed to amend the Exclusive Supply Agreement, Sigma would set up a separate production site for Sodium Benzoate creating as many as seven additional ANDA competitors for the Indication; and
- despite MAIA's requests, Sigma refused to tell MAIA the names of the two companies that were seeking the Sodium Benzoate.

29. Based on those representations, MAIA agreed to negotiate an amendment that would permit a very limited number of future ANDA filings supported by Sigma's supply of Sodium Benzoate. Given the representations made by Sigma, MAIA negotiated the terms of the Amendment to allow Sigma to release its Drug Master File to another company but not until 2017 to support a possible launch in 2019 — at least two years after the expected approval and launch of MAIA's ANDA product.

30. On March 10, 2016, still working under the belief that Sigma wanted to add two companies who were "significantly behind" MAIA, MAIA sent Sigma a red-line edit of the proposed amendment to the Exclusive Supply Agreement ("proposed amendment"); a signed copy of the edited proposed amendment; and a request that the proposed amendment be countersigned and returned.

31. On March 15, 2016—prior to receiving any return communication from Sigma regarding the proposed amendment—MAIA learned that the FDA approved another ANDA for generic Ammonul® which is owned by RD2Rx, LLC, Ailex Pharmaceuticals Pvt. Ltd., Trigen Laboratories, LLC or their respective affiliates (collectively, "Trigen"). MAIA also learned that Sigma was supporting Trigen's proposed Sodium Benzoate product and that it intended to begin supplying Trigen with the Sodium Benzoate API beginning in April 2016. Sigma never disclosed to MAIA its deceptive relationship with Trigen during the negotiations to amend the Exclusive Supply Agreement.

32. Because of Sigma's deliberate deception, when MAIA learned that the FDA had approved Trigen's ANDA on February 24, 2016–during the period the proposed amendment was still being discussed—it did not occur to MAIA that Trigen was one of the two companies that Sigma wanted to include in the amendment.

33. Tellingly, Sigma never attempted to correct its past misstatements, even after Trigen's approval became public.

34. On March 16, 2016, MAIA, through its representative Bikram Malik, immediately contacted Sigma by email and revoked MAIA's March 10, 2016 offer to amend the Exclusive Supply Agreement prior to Sigma delivering to MAIA any counter-signed copy of the proposed amendment.

35. On March 16, 2016 Sigma claimed that it had counter-signed the amendment before MAIA's revocation even though it had not returned it to MAIA.

## FIRST COUNT – BREACH OF CONTRACT

36. MAIA restates the allegations stated in paragraphs 1 through 35 above, as if fully set forth below.

37. MAIA and Sigma entered into the Exclusive Supply Agreement for the exclusive supply of Sodium Benzoate on August 28, 2015.

38. MAIA has faithfully fulfilled is obligations to Sigma under the Exclusive Supply Agreement.

39. Sigma has breached the Agreement by working with, agreeing to supply, and stating its intention to immediately supply Sodium Benzoate for the Indication to Trigen.

40. For the reasons stated above, the proposed amendment to the Exclusive Supply Agreement is neither valid nor enforceable.

41. Under the Exclusive Supply Agreement, Sigma agreed that its Arklow, Ireland facility will manufacture and supply the API to MAIA on an exclusive basis for the Indication.

42. Sigma has breached the Agreement, repudiated its obligations, and continues to breach its obligations to MAIA under the Exclusive Supply Agreement.

43. As a direct result of the breach, MAIA will suffer irreparable injury for which monetary damages will not fully compensate or are difficult to measure and there is or may be no adequate remedy at law unless and until this Court awards appropriate equitable relief, which includes (a) an order holding the proposed amendment to the Exclusive Supply Agreement to be invalid, (b) an injunction that prevents Sigma from shipping any Sodium Benzoate to any third party entities, including Trigen, and (c) any other relief the Court deems appropriate.

44. As a direct and consequential result of Sigma's breach of its contractual obligations to MAIA under the Exclusive Supply Agreement, MAIA has incurred expenses and will suffer monetary damages in an amount exceeding $75,000.

## SECOND COUNT – EQUITABLE FRAUD AS TO PROPOSED AMENDMENT

45. MAIA restates the allegations stated in paragraphs 1 through 44 above, as if fully set forth below.

46. Sigma made material misrepresentations with respect its relationship with other pharmaceutical companies. During the October 28, 2015 call, Ennis represented that:

    - "You [MAIA] are the only ANDA that sitting out there at the moment for us [Sigma]."
    - One of the two companies "hasn't even done their stability batches yet. They need material from two batches from us, and is certainly going to be late next year

by the time they would get material from two batches. The other customer is significantly behind as well on the thing."

- The two companies are "miles behind you."
- These two companies are "significantly behind you."
- "Sigma-Aldrich will bring competitors against you. So do you want it to be two or do you want that to be loads?"
- "You [MAIA] are certainly going to be more than first to the market at this particular juncture."
- Ennis confirmed that that the "timeline" the other two companies were looking at would put their ANDA filings sometime in March or April of 2017 at the earliest.

47. During the November 11, 2015 call, Ennis represented:

- Ennis represented that MAIA was "way ahead of the game."
- Ennis represented that the two companies were at least "18 months literally behind you [MAIA]."
- When MAIA requested that Sigma identify the two companies, Sigma refused, but agreed to supply the names *after* the proposed amendment was signed.

48. Sigma made additional misrepresentations to MAIA including:

- that it had supplied some Sodium Benzoate to two companies in the past and that these companies' development programs were significantly behind MAIAs' program;
- that neither of these companies filed an ANDA using Sodium Benzoate for the Indication;

- that the companies were seeking the Sodium Benzoate to support the filing of an ANDA but not before 2017 to support a possible launch in 2019—at least two years after expected approval and launch of MAIA's ANDA product;

- unless MAIA agreed to amend the Exclusive Supply Agreement, Sigma would set up a separate production site for Sodium Benzoate creating as many as seven additional ANDA competitors for the Indication; and

- despite MAIA's requests, Sigma refused to tell MAIA the names of the two companies that were seeking the Sodium Benzoate.

49. Each of these statements above were false and were specifically designed to trick MAIA into signing away its exclusivity.

50. MAIA did in fact rely upon Sigma's material misrepresentations, set forth above, in considering whether to amend the Exclusive Supply Agreement. MAIA continued to discuss amending the Exclusive Supply Agreement with Sigma but was unaware of Sigma's relationship with Trigen.

51. As a direct and proximate consequence of Sigma's actions, omissions, and misrepresentations, MAIA will experience price erosion, lose market share, forfeit customers' good will, and suffer lost profits.

52. Upon learning of these misrepresentations, MAIA rescinded its offer to agree to the Exclusive Supply Agreement. In the event that this Court finds Sigma's acceptance effective, however, the proposed amendment is unenforceable and MAIA is entitled to a finding of equitable fraud based on the allegations stated above.

53. MAIA is entitled to one or more forms of equitable relief, including: (a) a total rescission of the proposed amendment to the Exclusive Supply Agreement; (b) an injunction

prohibiting Sigma from shipping Sodium Benzoate to any third party, including Trigen, for the purposes of launching a generic version of Ammonul®; and (c) other such equitable relief as may be necessary.

### THIRD COUNT – LEGAL FRAUD AS TO PROPOSED AMENDMENT

54. MAIA restates that allegations stated in paragraphs 1 through 53 above, as if fully set forth below.

55. Sigma made material misrepresentations with respect to its relationship with other pharmaceutical companies. During the October 28, 2015 call, Ennis represented that:

    - "You [MAIA] are the only ANDA that sitting out there at the moment for us [Sigma]."
    - One of the two companies "hasn't even done their stability batches yet. They need material from two batches from us, and is certainly going to be late next year by the time they would get material from two batches. The other customer is significantly behind as well on the thing."
    - The two companies are "miles behind you."
    - These two companies are "significantly behind you."
    - "Sigma-Aldrich will bring competitors against you. So do you want it to be two or do you want that to be loads?"
    - "You [MAIA] are certainly going to be more than first to the market at this particular juncture."
    - Ennis confirmed that that the "timeline" the other two companies were looking at would put their ANDA filings sometime in March or April of 2017 at the earliest.

56. During the November 11, 2015 call, Ennis represented:

13

- Ennis represented that MAIA was "way ahead of the game."
- Ennis represented that the two companies were at least "18 months literally behind you [MAIA]."
- When MAIA requested that Sigma identify the two companies, Sigma refused, but agreed to supply the names *after* the proposed amendment was signed.

57. Sigma made additional misrepresentations to MAIA including:

- that it had supplied some Sodium Benzoate to two companies in the past and that these companies' development programs were significantly behind MAIAs' program;
- that neither of these companies filed an ANDA using Sodium Benzoate for the Indication;
- that the companies were seeking the Sodium Benzoate to support the filing of an ANDA but not before 2017 to support a possible launch in 2019—at least two years after expected approval and launch of MAIA's ANDA product;
- unless MAIA agreed to amend the Exclusive Supply Agreement, Sigma would set up a separate production site for Sodium Benzoate creating as many as seven additional ANDA competitors for the Indication; and
- despite MAIA's requests, Sigma refused to tell MAIA the names of the two companies that were seeking the Sodium Benzoate.

58. Sigma had knowledge that its representations were false.

59. The representations made by Sigma were intended to cause MAIA to agree to amend the Exclusive Supply Agreement existing between Sigma and MAIA.

60. MAIA did in fact rely upon Sigma's misrepresentations in considering whether to amend the Exclusive Supply Agreement.

61. As a direct and proximate consequence of Sigma's actions, omissions, and misrepresentations, MAIA will experience price erosion, lose market share, forfeit customers' good will, and suffer lost profits.

62. Upon information and belief, Sigma willfully, wantonly and recklessly disregarded its obligation to provide truthful representations during negotiations to amend the contract between Sigma and MAIA.

63. Among the appropriate forms of legal relief are the following: (a) actual, nominal, consequential and punitive damages; (b) attorneys' fees, costs, and expenses; and (c) any such other relief as the Court deems just and appropriate.

### FOURTH COUNT - BREACH OF COVENANTS OF GOOD FAITH AND FAIR DEALING

64. MAIA restates that allegations stated in paragraphs 1 through 63 above, as if fully set forth below.

65. As part of the Exclusive Supply Agreement Sigma was obligated to deal fairly and in good faith with MAIA and to act in a way that was faithful to the agreed purpose of the Exclusive Supply Agreement and MAIA's reasonable expectations.

66. MAIA has faithfully fulfilled is obligations to Sigma under the Exclusive Supply Agreement.

67. By engaging in a course of conduct to deprive MAIA of its exclusive rights under the Exclusive Supply Agreement, Sigma has breached the covenants of good faith and fair dealing implicit in the Exclusive Supply Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, the plaintiff MAIA seeks the following relief as well as such other relief as the Court deems appropriate and just:

A. An order awarding a preliminary and permanent injunction against defendant Sigma, its affiliates, and all parties acting in concert or participation with them (including, but not limited to any officer, employee, agent or other representative of Sigma), that restrains and enjoins each of them from, directly or indirectly, (i) shipping Sodium Benzoate to Trigen for use in manufacturing a generic Ammonul®, (ii) shipping Sodium Benzoate to any third party for the Indication, or (iii) taking any other action that may violate the Exclusive Supply Agreement between MAIA and Sigma;

B. In the alternative, should the Court find that Sigma effectively accepted MAIA's offer to amend, an order finding the proposed amendment to the Exclusive Supply Agreement unenforceable;

C. An order providing such other appropriate equitable relief against the defendant as may be necessary to fully enforce the provisions of the Exclusive Supply Agreement;

D. Actual, nominal, consequential and punitive damages;

E. An order awarding pre-judgment interest, post-judgment interest and costs as may be established by the Court;

F. All costs and expenses incurred in connection with this action; and

G. Such other and further relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of all issues so triable.

Dated: April 28, 2016         By: _____
                                  Ruth A. Rauls
                                  Saul Ewing LLP
                                  650 College Road East
                                  Suite 4000
                                  Princeton, NJ 08540-6603
                                  (609) 452-5049
                                  rrauls@saul.com

                                  Of Counsel:

                                  John C. Dougherty (*pro hac vice* applications to be filed)
                                  David Herman (*pro hac vice* applications to be filed)
                                  Laura E. Krawczyk
                                  FROMMER LAWRENCE & HAUG LLP
                                  745 Fifth Avenue
                                  New York, New York 10151
                                  (212) 588-0800
                                  jdougherty@flhlaw.com
                                  dherman@flhlaw.com
                                  lkrawczyk@flhlaw.com

                                  *Attorneys for Plaintiff MAIA Pharmaceuticals, Inc.*

## L.CIV.R. 11.2 CERTIFICATION

The undersigned hereby certifies that, to the best of her knowledge, this matter is not the subject of any other action pending in any court, or any pending or contemplated arbitration or administrative proceeding. The undersigned further certifies that, to the best of her knowledge, there are no additional parties who should be joined in this matter.

> **SAUL EWING LLP**
> *Attorneys for Plaintiff MAIA Pharmaceuticals, Inc.*
>
> By: _____
> RUTH A. RAULS

Dated: April 28, 2016

## VERIFICATION

I, Bikram Malik, of full age, hereby verify that I am the Manager of Plaintiff and that the things set forth in this Verified Complaint are true to the best of my personal knowledge and belief. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____
BIKRAM MALIK

Dated: April 28, 2016